UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

DAVID LEE KELLEY, )
)
Plaintiff, )
)
v. ) Case No. 5:16-cv-195
)
NANCY BERRYHILL, Acting )
Commissioner of Social Security,[1] )
)
Defendant. )

## OPINION AND ORDER
### (Docs. 5, 8)

Plaintiff David Lee Kelley brings this action under 42 U.S.C. § 405(g), requesting review and remand of the decision of the Commissioner of Social Security denying his application for a period of disability and disability insurance benefits (DIB) and for supplemental security income (SSI). (Doc. 3.) Currently pending is Mr. Kelley's motion to reverse the decision of the Commissioner (Doc. 5) and the Commissioner's motion to affirm (Doc. 8). For the reasons stated below, Mr. Kelley's motion is GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED for further proceedings and a new decision.

### Background

Mr. Kelley was 58 years old on his alleged disability onset date of October 18, 2012. He testified that he was working full-time in September 2012, but he stopped working because of pain in his eye and his head. (AR 32.) His right eye was removed on October 4, 2012 due to chronically untreated glaucoma. (*See* AR 32, 664, 667, 849.) On October 18, 2012, he suffered a heart attack and underwent a stent procedure. (*See* AR 32, 332, 342, 508, 582.) Dr. David

---

[1] The court has amended the caption to reflect the current Acting Commissioner of Social Security, who assumed office on January 20, 2017. *See* Fed. R. Civ. P. 25(d).

Bourgeois, who has been treating Mr. Kelley since October 3, 2012, stated in a February 9, 2015 letter that after the eye operation, Mr. Kelley "has had a cascade of medical decompensation with fatigue and lack of endurance persisting despite stabilization of his medical problems." (AR 849.) Other medical problems mentioned in the record include (but are not limited to) diabetes (diagnosed at the time he was admitted for the heart attack) (AR 35, 349), iron deficiency anemia (AR 41, 829),[2] and low back pain (sometimes referred to in the record as lumbago) (AR 30, 41, 830). He smokes about 50 packs of cigarettes per year, which medical notes suggest may be associated with chronic obstructive pulmonary disease (COPD). (AR 786.)

Mr. Kelley completed school up to the 10th grade. (AR 29.) He previously worked for 17 years doing machine maintenance for Tillotson Healthcare in New Hampshire. (*See* AR 32, 210.) Then, between 2004 and September 2012, he worked full-time for several different companies, including work operating a mold press to make helmets, automotive mechanic work, quality control inspecting helmets, and operating a stapler machine. (AR 33–34, 211.) After his eye procedure and heart attack in October 2012, he was on short-term and long-term disability. (AR 34.) Then, through an organization that helps people over age 55, he began doing part-time janitorial work (20 hours per week) at the municipal building in Newport, Vermont. (AR 37.)

In an adult function reported dated June 21, 2013, Mr. Kelley stated that he does not see as well as he used to, that he cannot stand for eight hours anymore, that he gets tired very easily, and that he becomes dizzy when he gets up from sitting too quickly. (AR 225.) He states that in a typical day he tests his blood sugar, has breakfast, goes for a half-mile walk, takes care of his

---

[2] Anemia is "[a]ny condition in which the number of red blood cells/mm, the amount of hemoglobin in 100 mL of blood, and/or the volume of packed red blood cells/100 mL of blood are less than normal." *Stedman's Medical Dictionary* 35950 (WL updated Nov. 2014) (footnote omitted). "Anemia is frequently manifested by pallor of the skin and mucous membranes, shortness of breath, palpitations of the heart, soft systolic murmurs, lethargy, and tendency to fatigue." *Id.*

2

dog, works around the house, takes a nap, and watches television. (AR 226.) Since he began the janitorial job, he spends mornings working at the municipal building and naps in the afternoon. (AR 30–31.)

Mr. Kelley's janitorial work consists of mopping and emptying small trash cans in offices. (AR 30, 38.) Another janitor takes care of the bigger trash cans and the harder mopping. (AR 38.) Mr. Kelley testified that in his four-hour workday, he takes 10–20 breaks, each lasting five to ten minutes, because he is "just plain tired all the time" and because his lower back hurts. (AR 30, 37–38.) He also testified that he misses work a couple of days per month because he is tired and doesn't feel well. (AR 39.) He makes up for missed days by working longer hours, but when he does that, he naps for an hour or an hour and a half longer in the afternoons. (*Id.*)

Mr. Kelley filed applications for DIB and SSI in summer 2013. (AR 191, 198.) The claims were denied initially on October 15, 2013 (AR 60, 71), and on reconsideration on January 10, 2014. (AR 85, 97.) He requested a hearing, and Administrative Law Judge Thomas Merrill conducted an administrative hearing on February 18, 2015. (AR 26–50.) Mr. Kelley testified at the hearing, where he was represented by Attorney James Torrisi. Vocational Expert (VE) James Parker also testified.

On March 10, 2015, the ALJ issued a decision concluding that Mr. Kelley has not been under a disability as defined in the Social Security Act from October 18, 2012 through the date of the decision. (AR 9–20.) Mr. Kelley appealed, and on May 23, 2016, the Appeals Council denied his request for review. (AR 1.) Mr. Kelley filed his complaint in this case on July 11, 2016. (Doc. 3.)

3

## ALJ Decision

Social Security Administration regulations set forth a five-step, sequential evaluation process to determine whether a claimant is disabled. *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014). First, the Commissioner considers "whether the claimant is currently engaged in substantial gainful activity." *Id.* Second, if the claimant is not currently engaged in substantial gainful activity, then the Commissioner considers "whether the claimant has a severe impairment or combination of impairments." *Id.* Third, if the claimant does suffer from such an impairment, the inquiry is "whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments." *Id.* Fourth, if the claimant does not have a listed impairment, the Commissioner determines, "based on a 'residual functional capacity' assessment, whether the claimant can perform any of his or her past relevant work despite the impairment." *Id.*

Finally, if the claimant is unable to perform past work, the Commissioner determines "whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience." *Id.*; *see* 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden of proving his case at steps one through four. *McIntyre*, 758 F.3d at 150. At step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

The ALJ found at step one that Mr. Kelley has not engaged in substantial gainful activity since October 18, 2012, the alleged onset date. (AR 11.) At step two, the ALJ found that Mr. Kelley has the severe impairments of glaucoma status post right eye removal, and diabetes mellitus. (AR 12.) The ALJ noted that other diagnoses appear in the record, and specifically mentioned Mr. Kelley's history of heart disease and low back pain, but did not find any

4

impairments to be severe aside from the eye removal and the diabetes. (*See id.*) At step three, the ALJ concluded that Mr. Kelley does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 13.)

Next, the ALJ determined that, Mr. Kelley has the residual functional capacity (RFC) to perform "a full range of work at all exertional levels but with the following nonexertional limitations: he has monocular vision, but he retains the ability to avoid ordinary hazards in the workplace." (*Id.*) At step four, the ALJ concluded that Mr. Kelley is capable of performing past relevant work as an automotive mechanic, molder, and helmet inspector. (AR 19.) According to the ALJ, those jobs "do not require the performance of work-related activities precluded by the claimant's residual functional capacity." (*Id.*) The ALJ accordingly did not reach step five, and concluded that Mr. Kelley has not been under a disability from October 18, 2012 through the date of the decision. (AR 20.)

## Standard of Review

Disability is defined by the Social Security Act in pertinent part as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the Act, a claimant will only be found disabled if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

In considering the Commissioner's disability decision, the court conducts "'a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied.'" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)); *see also* 42 U.S.C. § 405(g). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Poupore*, 566 F.3d at 305 (quoting *Consol. Edison Co. of N.Y. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938)). The "substantial evidence" standard is even more deferential than the "clearly erroneous" standard; facts found by the ALJ can be rejected "only if a reasonable factfinder would *have to conclude otherwise.*" *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)). The court is mindful that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Mr. Kelley argues that the ALJ's decision should be reversed for payment of benefits or for another hearing for two reasons: (1) the ALJ erred in his evaluation of medical opinion evidence including the opinion of treating physician Dr. Bourgeois, and (2) substantial evidence does not support the ALJ's finding that Mr. Kelley's statements regarding his symptoms were "not entirely credible." (*See* Doc. 5-1 at 1.) The Commissioner maintains that substantial evidence supports the ALJ's decision and that the correct legal standards were applied. (Doc. 8 at 1–2.)

I. **Dr. Bourgeois**

　A. **Treating-Physician Rule**

The treating-physician rule "generally requires a measure of deference to the medical opinion of a claimant's treating physician." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam); *see also* 20 C.F.R. §§ 404.1527, 416.927(c)(2) (2012).[3] Under the rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (alteration in original) (quoting 20 C.F.R. § 404.1527(c)(2)).

Even when a treating physician's opinion is not given controlling weight, it is still entitled to some weight because treating physicians are "likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If a treating physician's opinion is not given controlling weight, the weight to be given the opinion depends on several factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the relevant evidence supporting the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is of a specialist; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6).

---

[3] Sections 404.1527 and 416.927 have been revised effective March 27, 2017. *See generally Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). Throughout this decision, unless otherwise noted, the court cites and applies the regulations that were in effect at the time of the ALJ's decision.

The Commissioner is required to give "good reasons" for the weight given to a treating source's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). Nevertheless, the ALJ is not required to "slavish[ly]" recite each of the factors; the ALJ's analysis is sufficient if his or her "reasoning and adherence to the regulation are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013); *see also Batease v. Berryhill*, No. 2:16-cv-133-jmc, 2017 WL 1102659, at *7 (D. Vt. Mar. 24, 2017) (ALJ "need not explicitly discuss each of the regulatory factors; rather, he or she must apply 'the substance of the treating physician rule'" (quoting *Halloran*, 362 F.3d 28 at 32)); *Alexander v. Comm'r of Soc. Sec.*, No. 5:14-cv-00039, 2014 WL 7392112, at *5 & n.1 (D. Vt. Dec. 29, 2014) (court may find that ALJ considered evidence even if ALJ did not cite it).

### B. Dr. Bourgeois's Opinions

Here, Dr. Bourgeois supplied two opinions. First, in a medical assessment dated December 26, 2014, Dr. Bourgeois stated that Mr. Kelley has exertional and postural impairments, including limitations in walking or sitting more than four hours in an eight-hour day, inability to climb, balance, crouch, or crawl, and limitations in reaching, feeling, pushing, and pulling. (AR 812–14.) According to Dr. Bourgeois, Mr. Kelley's limitations arose because of an "accumulation of multiple issues disabling after MI [heart attack] 10/29/2012." (AR 814.) Dr. Bourgeois stated that he would expect Mr. Kelley to miss more than three work days per month due to his impairments, explaining: "fatigue and physical limitations with inability to recondition" and "frequent bad days with [increased] symptoms." (*Id.*) In support of his assessments, Dr. Bourgeois referred to the notes from a December 26, 2014 physical examination that he performed. (*See* AR 815–19.)

8

Dr. Bourgeois's second opinion is his February 9, 2015 letter. It states:

> David Kelley has been a patient of mine at Orleans Medical Clinic since 10/3/[2012] at which time he was being cleared for emergent surgery on his eye for chronically untreated glaucoma of his right eye which resulted in blindness and enucleation of that eye. Since that operation the patient has had a cascade of medical decompensation with fatigue and lack of endurance persisting despite stabilization of his medical problems. He cannot move past part time and unpredictable work days, with need for daily naps after only half day, lighter duty task[s]. He was cleared to return to work in July 2013 but has not succeeded to gain endurance for full time work. This is despite recovery from moderate severe anemia with persistent low grade chronic anemia and recovery of his iron deficiency, recovery from his decompensated CAD [coronary artery disease] but at baseline with persistent fatigue. He also has persistent metabolic stress from his Diabetes Mellitus and the strain of chronic pain from his Lumbago compounding his fatigue.
>
> David [has] attempted to return to meaningful work but at this time is disabled by his multiple disease[s] cumulatively resulting in persistent fatigue and lack of endurance or the ability to regain endurance.

(AR 849.)

## C. ALJ's Reasons for Giving "Limited Weight" to Dr. Bourgeois's Opinions

The ALJ acknowledged that Dr. Bourgeois is a treating source, but gave "limited weight" to Dr. Bourgeois's opinions for five reasons. (AR 18.) First, the ALJ reasoned that Dr. Bourgeois "is only a family physician and thus lacks any particular expertise in the claimant's eye condition or diabetes mellitus." (*Id.*) "Second, and most persuasively, his very restrictive residual functional capacity is inconsistent with the claimant's own presentation in treatment, where Dr. Bourgeois provides few, if any functional limitations that would support his limitations as described." (*Id.*)

Third, the ALJ noted that Mr. Kelley's cardiologist, Dr. Andrew Torkelson, released him to return to work in January 2013, only three months after the heart attack. (AR 19.) Fourth, the ALJ concluded that "Dr. Bourgeois's opinion is quite different than all other sources of record, calling it into question compared to the others." (*Id.*) Finally, the ALJ stated that

9

"Dr. Bourgeois's cited limitations to a range of part-time work appear to be based on nothing but the claimant's self report, as such a finding is not supported by any specific objective testing, metrics, or findings." (*Id.*) Mr. Kelley challenges each of the five reasons given by the ALJ.[4]

### D. Specialization

The first reason—that Dr. Bourgeois is not a specialist in treatment of the eyes or diabetes—shows that the ALJ was mindful of the fifth factor in the regulations, but this only weakly supports the weight accorded to Dr. Bourgeois's opinion. The doctor's opinion mentions Mr. Kelley's eye procedure and his diabetes, but asserts impairments due to persistent fatigue and lack of endurance. Dr. Bourgeois does not opine that the eye procedure caused the fatigue or lack of endurance. He opines that metabolic stress from diabetes compounds the fatigue, but does not state that diabetes is the sole cause. Moreover, although he may not be a specialist in endocrinology or diabetes, his opinion falls squarely within the expected expertise of a family physician who must maintain familiarity with a wide range of human conditions.

### E. Dr. Torkelson's January 2013 Release to Work

The third rationale—Dr. Torkelson's January 2013 decision to release Mr. Kelley to work—is also relatively weak. After Mr. Kelley's October 2012 heart attack and treatment, Dr. Torkelson assessed him in January 2013 as doing "great," and cleared him to return to work.

---

[4] Mr. Kelley also faults the ALJ's evaluation of medical opinion evidence on several other grounds. He asserts that the ALJ actually gave no weight to Dr. Bourgeois's opinion, since the ALJ's RFC includes no exertional limitations and no limitations due to fatigue. (Doc. 5-1 at 6.) The court rejects that argument, since the ALJ apparently did give weight to the portions of the opinion mentioning Mr. Kelley's diabetes and back pain, recounting treatment of his eye, and noting recovery from anemia, iron deficiency, and decompensated CAD. Additionally, Mr. Kelley argues that the ALJ failed to analyze some of the six factors under the regulations for determining the weight to give to a treating physician's opinion. (*Id.* at 11.) Similarly, Mr. Kelley asserts that the ALJ made "no systematic attempt to consciously comply with the regulation, weighing each factor so it can be reviewed properly," and focused "selectively" on some factors and not others (*Id.*) As noted above, however, the ALJ is not required to slavishly recite each factor. The court focuses on the ALJ's analysis and reasoning, discussed below.

(AR 526.) But it is unclear whether Dr. Torkelson intended to account for any conditions other than Mr. Kelley's level of recovery from the heart attack and treatment for that event. In fact, Dr. Torkelson's statement was qualified that it was only "from [his] perspective." (*Id.*) The court understands this statement to mean only that Mr. Kelley recovered well from his heart attack. Dr. Bourgeois's opinion is that Mr. Kelley accumulated multiple issues before and after his heart attack.

### F. Mr. Kelley's Presentation in Treatment; Objective Findings

The ALJ's second, fourth, and fifth reasons for giving "limited weight" to Dr. Bourgeois's opinion relate primarily to the factors regarding the relevant evidence supporting the opinion and the consistency of the opinion with the record as a whole. The ALJ identified the second reason—inconsistency with the claimant's own presentation in treatment—as the most persuasive, so the court begins there. According to the ALJ, Dr. Bourgeois's treatment notations "fail to support such a restricted range of part-time work." (AR 18.) The ALJ highlighted the "narrative" portions of Dr. Bourgeois's treatment notes from December 26, 2014 and January 27, 2015.

The December 26, 2014 note (mentioned above) indicates in a narrative regarding the "history of present illness" that the appointment was a "recheck" following up on Mr. Kelley's heart attack, and that Mr. Kelley described his symptoms as "mild and improving" but with "some dizziness when first standing up sometimes." (AR 815.) Dr. Bourgeois also noted that "[b]y report there is good compliance with treatment, good tolerance of treatment and good symptom control." (*Id.*) Mr. Kelley reported that he was generally "[f]eeling well." (AR 816.) At the January 27, 2015 follow-up appointment, Dr. Bourgeois noted that Mr. Kelley reported he

was "doing good," and again noted "mild and improving" symptoms, good tolerance of treatment, and good symptom control. (AR 823.)

The ALJ found that these "narrative" portions of the December 2014 and January 2015 treatment notes "support[] generally good functioning" (AR 16) and "fail to support such a restricted range of part-time work" (AR 18). But both narratives appear to be focused on the symptoms and recovery from the heart attack rather than any other conditions or symptoms. And, more importantly, both narratives also indicate that Mr. Kelley is "unable to work." (AR 815, 823.) That notation—although unaccompanied by any elaboration in the narrative—is not consistent with the ALJ's interpretation of the narratives.

Moreover, the narratives cannot be read in isolation. Other portions of the December 2014 and January 2015 treatment notes address issues beyond Mr. Kelley's recovery from the heart attack, and are consistent with Dr. Bourgeois's opinion regarding multiple medical issues, fatigue, and lack of endurance. In the December 26, 2014 treatment note, Dr. Bourgeois wrote the following assessment under a section regarding Mr. Kelley's coronary artery disease: "[E]xercise ineffective with endurance lacking and inability to work more than half time with frequent 'bad days' having to miss work or shorten day; this disability appears to be permanent since 2012." (AR 818.) Dr. Bourgeois also noted that Mr. Kelley's lumbago "compounds disability with fatigue and limits physical activity on a daily basis." (*Id.*) Regarding diabetes, Dr. Bourgeois wrote "comorbid with easy fatigability." (*Id.*) At the January 2015 appointment, Dr. Bourgeois remarked: "[t]he complexity and risk of medical decision-making for today's visit was high (multiple medical problems, prescription medications with potential toxicities and/or ordering and review of diagnostic studies)." (AR 828.)

The ALJ stated that he reviewed the objective examinations but found them to be "suspect" because "[i]n multiple sessions across multiple months, the claimant presented with a nearly identical objective clinical presentation." (AR 16.) In particular, the ALJ remarked the notes consistently included observations of "unkempt" appearance and a "mildly antalgic gait." (*Id.*) According to the ALJ, "the claimant presents with more or less identical functional limitations in multiple sessions with Dr. Bourgeois, which either supports remarkable continuity in presentation over time or a finding that the objective findings often repeat in treatment notes without new examinations." (AR 18–19.) The ALJ found that the former explanation seemed "unlikely." (AR 16.) Mr. Kelley disagrees. (*See* Doc. 5-1 at 9 ("[T]he ALJ seemed to doubt the existence of the exams because the results were so consistent.").)

Neither the ALJ nor the Commissioner cite any authority for the proposition that identical entries in a series of treatment notes might undermine the validity of the entries or the notes themselves. To the contrary, this court and others rely on treatment notes that are consistent over time. *See Nesevitch v. Colvin*, No. 3:15-CV-935, 2016 WL 5717270, at *18 (N.D.N.Y. Sept. 30, 2016) (ALJ properly gave less weight to physician's opinion regarding physical limitations, in part because treatment notes consistently showed intact gait); *Millard v. Comm'r of Soc. Sec.*, No. 5:13-cv-00261, 2014 WL 6485807, at *4 (D. Vt. Nov. 19, 2014) (unfavorable decision supported by substantial evidence, including claimant's primary care physician's treatment notes which consistently reported normal gait); *Metz v. Comm'r of Soc. Sec.*, No. 3:11-cv-391, 2012 WL 3776435, at *4, 8 (S.D. Ohio Aug. 30, 2012) (treating physician's opinion was consistent with the record and supported by objective medical evidence, including consistent notations of antalgic gait). Even assuming that treatment notes might be suspect where notations are exactly the same over time, that is not the case here, as described below. In sum, the court

13

concludes that the ALJ's reason for discounting Dr. Bourgeois's treatment notes is not a good reason.

What do the treatment notes show? In a January 21, 2014 letter, Dr. Torkelson noted Mr. Kelley's issues with chronic fatigue and anemia, and remarked that "[h]e does look pale and this is likely the etiology of his fatigue." (AR 786.) Dr. Bourgeois's December 26, 2014 and January 27, 2015 treatment notes indicate that Mr. Kelley appeared pale. (AR 816, 825.) Notes from those dates and from November 29, 2012 indicate the presence of fatigue. (*See* AR 549, 818, 827.) Dr. Bourgeois's earlier treatment notes uniformly indicate the presence of anemia. (AR 535, 540, 544, 549, 554, 558, 680, 687, 792, 816, 824.) On multiple occasions, Dr. Bourgeois remarked that "[t]he onset of the anemia has been gradual and has been occurring in a persistent pattern for months. The course has been recurrent. The anemia is described as mild." (AR 679, 791, 823.) In February 2014, Dr. Bourgeois referred Mr. Kelley to a specialist for his iron deficiency anemia. (AR 733.) In January 2015 Dr. Bourgeois described Mr. Kelley's anemia as "slightly worsening." (AR 827.)

Treatment notes do not appear to include any actual COPD diagnosis. Notes indicate that Mr. Kelley was a lifelong smoker prior to his heart attack, but that he stopped smoking for several months after that event. (*See* AR 539, 543, 548, 553, 557, 562.) Beginning in July 2013, he had returned to smoking a pack per day. (*See* AR 535, 679, 686, 791.) At an October 28, 2014 appointment, Dr. Bourgeois counseled Mr. Kelley on smoking cessation, and indicated that he eventually needs a pulmonary evaluation. (AR 830.)

Regarding back pain, treatment notes consistently indicated that Mr. Kelley appeared to be in pain, that he has a stooped posture, uses his hands to rise from his chair, and has decreased range of motion in his spine. (AR 535–37, 540, 541, 544, 545, 549, 550, 554, 555, 558, 560,

563–64, 680–81, 687–88, 793–94, 816–17, 825–26.) Mr. Kelley's gait was noted as "normal" from October 2012 through February 2014 (AR 536, 540, 544, 549, 554, 558, 563, 680, 687), but as "mildly antalgic" in July and December 2014 and January 2015 (AR 793, 816, 825). The July and December 2014 and January 2015 notes indicate the presence of paraspinous muscle spasm. (AR 794, 817, 826.) Notes from July 28, 2014 indicate the presence of back pain and "[o]ngoing pain problem, Pain Frequency – Intermittent and Pain Location – back (down left leg)." (AR 792.) On January 28, 2015, Dr. Bourgeois referred Mr. Kelley for evaluation and treatment of chronic lumbago with bilateral hip pain. (AR 829.) In light of the notations recounted above, the court also concludes that the ALJ's fifth rationale—lack of specific objective findings—is not a good reason.

### G. Other Opinions

Finally, the court turns to the ALJ's fourth reason for giving "limited weight" to Dr. Bourgeois's opinion. The ALJ found that Dr. Bourgeois's opinion is "quite different" than the opinions of all other sources. (AR 19.) The court discusses those other opinions below.

#### 1. Dr. White and Dr. Abramson

Non-examining state agency physicians Dr. Elizabeth White and Dr. Leslie Abramson reviewed available medical records and rendered opinions at the initial and reconsideration steps, respectively. (AR 51–72; AR 75–98.) In opinions dated October 15, 2013 and January 6, 2014, Dr. White and Dr. Abramson both assessed no exertional, postural, or manipulative limitations. (AR 57, 68, 82, 94.)[5] The ALJ gave both opinions "significant weight," reasoning that Dr. White

---

[5] Dr. White and Dr. Abramson both found Mr. Kelley's statements regarding his symptoms less than fully credible in part because, they found, he "[f]ixes cars 4 days a week" and "[h]elps [his] brother in garage." (AR 56, 67, 81, 93.) Mr. Kelley's June 21, 2013 adult function report does mention fixing cars four days per week and helping his brother in the garage (AR 229), but in the context of other statements in that report, it is clear that Mr. Kelley is

15

and Dr. Abramson had reviewed a "substantial portion of the medical evidence," supported their findings with citations to the record, and assessed limitations that are consistent with the opinions of Mr. Kelley's heart and eye specialist providers (Dr. Torkelson and Dr. Katherine Lane). (AR 17.)

The court notes, however, that Dr. White and Dr. Abramson rendered their opinions in late 2013 and early 2014—well before Dr. Bourgeois wrote his December 2014 medical assessment and his February 2015 opinion letter. They therefore did not consider the significant opinions of Mr. Kelley's treating physician. The ALJ's assertion that they reviewed a "substantial portion of the medical evidence" is therefore not well supported in that critical respect. *See Bertram v. Colvin*, No. 5:14-cv-109, 2015 WL 4545770, at *13 (D. Vt. July 27, 2015) (noting that opinions of consulting sources should generally be given less weight if they conflict with the opinions of a treating source, particularly "where the consulting sources did not examine the claimant and made their opinions without considering all the relevant medical information").

### 2. Dr. Torkelson and Dr. Lane

As noted above, Mr. Kelley's treating cardiologist, Dr. Torkelson, cleared Mr. Kelley to return to work in January 2013. (AR 526.) But, as discussed above, Dr. Torkelson's clearance to return to work does not speak to the issues discussed by Dr. Bourgeois. In September 2013, Mr. Kelley's treating eye surgeon, Dr. Katherine Lane, opined that his monocular vision would

---

reporting that, since his alleged onset date, he no longer participates in those activities. (*See* AR 229 ("To[o] tired to work on cars after one [night]."); AR 230 ("Not working with my brother on cars I get to[o] tired out.").) In his opinion, the ALJ acknowledged that Dr. White and Dr. Abramson "may have misunderstood the extent of the claimant's work on cars," but found that "this does not disturb their overall findings." (AR 17.)

not prevent him from performing work-related activities. (*See* AR 667.) Like Dr. Torkelson's opinion, Dr. Lane's opinion has little bearing on the issues highlighted by Dr. Bourgeois.

For all of the above reasons, the court concludes that the ALJ failed to give good reasons for the weight he assigned to Dr. Bourgeois's opinions, and that a remand is required.

## II. Remaining Issues

Because the court concludes that a remand is required, it is unnecessary to address Mr. Kelley's argument on the issue of the ALJ's credibility determination. Because the court does not reach that issue, it also does not reach Mr. Kelley's related argument that the credibility analysis shows that he is disabled under the grids and is entitled to reversal for payment of benefits. On remand, the ALJ should reassess Mr. Kelley's credibility, particularly considering his good work history demonstrating gainful employment throughout most of his adult life. *See Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998) ("ALJs are specifically instructed that credibility determinations should take account of 'prior work record.'" (quoting SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996))).[6]

---

[6] Effective March 16, 2016, SSR 96-7p has been superseded by SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). The regulations and sub-regulatory policy no longer use the term "credibility," since "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2016 WL 1119029, at *1.

## Conclusion

The court GRANTS Mr. Kelley's motion to reverse (Doc. 5), DENIES the Commissioner's motion to affirm (Doc. 8), and REMANDS for further proceedings and a new decision in accordance with this ruling.

Dated at Rutland, in the District of Vermont, this 26 day of June, 2017.

Geoffrey W. Crawford, Judge
United States District Court